Irwin L. JACOBS, Gerald A. Schwalbach, Dennis M. Mathisen, Daniel T. Lindsay, and the "Shareholders' Committee to Revitalize Pabst," an unincorporated association, Plaintiffs,

v.

PABST BREWING COMPANY, a Delaware corporation, and Torray Clark & Co. Incorporated, a Maryland corporation, Defendants.

PABST BREWING COMPANY, a Delaware corporation, Counterclaim Plaintiff,

v.

Irwin L. JACOBS, Gerald A. Schwalbach, Dennis M. Mathisen, Daniel T. Lindsay, Ralph Klein, Rodney P. Burwell, Sam Singer, Francis A. Tarkenton and the "Shareholders' Committee to Revitalize Pabst," an unincorporated association, Counterclaim Defendants.

Civ. A. No. 82–200.

United States District Court,
D. Delaware.

Oct. 7, 1982.

**1052**

R. Franklin Balotti and Jesse Finkelstein of Richards, Layton & Finger, Wilmington, Del., and Yvette Miller of Weil, Gotshal & Manges, New York City, of counsel, for plaintiffs.

A. Gilchrist Sparks III and Lawrence A. Hamermesh of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Wachtell, Lipton, Rosen & Katz, New York City, and Michael, Best & Friedrich, Milwaukee, Wis., of counsel, for defendant Pabst Brewing Co.

Henry N. Herndon, Jr. and P. Clarkson Collins, Jr., of Morris, James, Hitchens & Williams, Wilmington, Del., and Jean S. Moore of Hogan & Hartson, Washington, D.C., of counsel, for defendant Torray Clark & Co. Inc.

Joseph J. Farnan, Jr., U.S. Atty., John X. Denney, Jr., Asst. U.S. Atty., Wilmington, Del., and Edward F. Greene, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, David A. Sirignano, Sp. Counsel and Robert Mills and Elisse B. Walter, Attys., Securities and Exchange Com'n and Paul Gonson, Sol., Securities and Exchange Com'n, Washington, D.C., as amicus curiae.

LATCHUM, Chief Judge.

This action arises out of a hard-fought proxy contest for control of Pabst Brewing Company ("Pabst"), between the incumbent management and an insurgent group, the Shareholders' Committee to Revitalize Pabst ("Revitalization Committee"). Plaintiffs Irwin L. Jacobs, Gerald A. Schwalbach, Dennis M. Mathisen, Daniel T. Lindsay, and the Revitalization Committee ("Jacobs Group") have filed a First Amended Complaint against Pabst and Torray Clark &

Co. Incorporated ("Torray Clark"), alleging six causes of action.[1] (Docket Item ["D.I."] 51.) The first three causes allege that Torray Clark, an investment advisor, did not comply with Sections 13(d) and (g) of the Securities and Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78m(d) & (g) (Supp.1980), and the rules and regulations promulgated thereunder. The fourth cause of action alleges that Pabst failed to comply with the requirements of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) (1976), and the rules and regulations promulgated thereunder. The fifth cause alleges that Pabst and Torray Clark violated Delaware common law by conspiring to cast proxies through misleading and illegal promises. Finally, the sixth cause alleges that Torray Clark breached the fiduciary duty which it owed to its investment clients, when Torray Clark failed to vote proxies for the slate of directors selected by its clients. (*Id.*)

The Jacobs Group requests this Court enter an order: (1) enjoining Torray Clark from casting any proxies for Pabst which it obtained in connection with the April 1982 election of Pabst directors; (2) declaring the proxies cast by Torray Clark in favor of Pabst directors to be null and void; (3) declaring that certain photocopied proxies received from various investment clients of Torray Clark, which were presented by the Revitalization Committee, to be valid and counted in determining the results of the 1982 annual election of Pabst directors; (4) declaring that all the proxies received by Pabst management by virtue of its misrepresentations to be null and void or, in the alternative, declaring the election to be invalid; (5) appointing a Master to supervise a new election, if the Court decides to declare a new election, and awarding damages to the Jacobs Group for the costs of the initial proxy contest; (6) granting plaintiffs' judgment against the defendants in the amount of the plaintiffs' attorneys' fees and disbursements incurred by virtue of

---

1. The plaintiffs filed an amended complaint on June 14, 1982 (D.I. 51), to which no objection was made and Torray Clark's motion to dismiss was directed to the amended complaint. (D.I. 66, p. 5.) Accordingly, the Court will grant leave to file the amended complaint.

defendants' wrongful conduct; (7) determining the validity of the 1982 election of Pabst directors and declaring those persons entitled to hold positions on the Board of Directors of Pabst; and (8) granting such other relief as may be just and proper.

Torray Clark has moved, pursuant to Rules 9(b) and 12(b)(6), F.R.Civ.P., to dismiss the Jacobs Group's amended complaint as to it upon the grounds that the complaint: (1) fails to state a cause of action against Torray Clark under the Exchange Act, the Delaware General Corporation law, or the Delaware common law; (2) fails to plead claims of fraud with sufficient particularity; (3) seeks injunctive relief that is inappropriate for violations alleged; and (4) is barred by doctrines of unclean hands and laches. (D.I. 27.)

FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT

Prior to the 1982 Annual Meeting of Pabst ("Annual Meeting"), held on April 13, 1982, the Revitalization Committee, an unincorporated association owning approximately 16.1% of the outstanding common stock of Pabst, waged a fierce proxy battle with the incumbent management of Pabst. Both incumbent management and the Revitalization Committee proposed competing slates of nominees for election to Pabst's Board of Directors and solicited proxies from Pabst shareholders. (D.I. 51, ¶ 17.)

During the course of this proxy contest, representatives of the Revitalization Committee and representatives of the incumbent management contacted and met with Torray Clark and its principals on various occasions to solicit the proxies of Torray Clark's clients.[2] As a result of meetings with these representatives and in the overall context of the proxy solicitation efforts, Torray Clark became aware sometime on or before March 1982 that its clients, who accounted for over 15 percent of the issued

common stock of Pabst, possessed the "swing vote" in the proxy contest. (D.I. 51, ¶ 19.)

According to the Jacobs Group, the events which immediately preceded the Annual Meeting demonstrated that Torray Clark attempted to use its "swing vote" power in order to effectuate a change of control of Pabst and to cause Pabst to enter into an extraordinary corporate transaction, such as a merger. Specifically, plaintiffs allege substantially the following facts:

(1) On April 7, 1982 the negotiations involving a proposed merger between Pabst and Schmidt was aborted.

(2) Prior to this termination of negotiations, Torray Clark had directed its clients to execute proxies in favor of Pabst's incumbent management.

(3) On April 8, 1982 Torray Clark informed the Revitalization Committee and Pabst that Torray Clark had directed its clients to vote in favor of the Revitalization Committee.

(4) On April 9, 1982 Torray Clark met with Pabst representatives.

(5) On that date Pabst promised Torray Clark that Pabst would shortly receive a new offer for its stock if present management were to remain in office.

(6) On April 10, 1982 Torray Clark informed representatives of the Revitalization Committee that Torray Clark's clients would now vote for management because management was committed to selling the company.

(7) On April 13, 1982 the management of Pabst purported to cast proxies received from Torray Clark at the Annual Meeting.

(*See* D.I. 51, ¶¶ 21–25.) The amended complaint further alleges that Torray Clark: (1) engaged in conversations with Pabst management, the Revitalization Committee and others, in which it expressed its approv-

---

**2.** Torray Clark is a corporation of the State of Maryland, with its principal place of business in Washington, D.C., and is registered with the SEC as an Investment Adviser under the Investment Advisers Act of 1940, 15 U.S.C. § 80b–3. In an amendment to its Schedule 13G filed with the SEC, Torray Clark stated

that as of February 4, it was the beneficial owner of 1,229,800 shares of common stock of Pabst constituting over 15 percent of the issued and outstanding common stock with sole power to dispose of (but not to vote) said shares. (D.I. 51, ¶ 12.)

al of, and desire to see the consummation of a Pabst/Schmidt combination or merger; (2) promised to deliver its clients' proxies in favor of the Revitalization Committee's slate of nominees only if the Revitalization Committee would support Schmidt's cash offer and/or undertake to sell Pabst; (3) met with representatives of Pabst to discuss a proposed sale of Pabst or a solicitation of offers to purchase all Pabst shares; (4) insisted that Pabst be sold and threatened to buy Pabst if Pabst was not sold; and (5) increased its clients' holdings of Pabst stock by the rapid accumulation of nearly 175,000 shares immediately prior to the record date for the Annual Meeting.

The question becomes whether these factual allegations of the amended complaint sufficiently state causes of action against Torray Clark under federal securities law or Delaware law.

IMPLIED CAUSE OF ACTION UNDER SECTION 13(d)

The first question that this Court must address is whether an implied cause of ac-

tion exists under Section 13(d). The Jacobs Group asserts that a shareholder may seek injunctive relief under Section 13(d) of the Exchange Act. Torray Clark disagrees.

At the outset, the Court notes that neither the United States Supreme Court nor the Court of Appeals for the Third Circuit has expressly determined whether an implied, private right of action exists under Section 13(d). Several Courts of Appeals, however, have either expressly or implicitly found that such an action exists.[3] Likewise, many district courts have held that a private right of action is implied under Section 13(d).[4] Other district courts, however, recently have been holding that some parties may not pursue a claim based upon Section 13(d).[5] Thus, although the bulk of the decisional authority supports the Jacobs Group's position, the recent restrictive trend by the Supreme Court with respect to the availability of an implied cause of action requires this Court to make its own in-depth analysis whether such a right of

**3.** See *Wellman v. Dickinson*, [Current] Fed.Sec. L.Rep. (CCH) ¶ 98,731 at 93,680 (C.A.2, 1981); *Dan River, Inc. v. Unitex, Ltd.*, 624 F.2d 1216, 1224 (C.A.4, 1980), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981); *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357, 380 (C.A.2, 1980); *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240, 248–49 (C.A.8, 1979); *General Aircraft v. Lampert*, 556 F.2d 90, 96 (C.A.1, 1977); *Missouri Portland Cement Co. v. H.K. Porter Co.*, 535 F.2d 388, 397 (C.A.8, 1976); *Stecher-Traung-Schmidt Corp. v. Self*, 529 F.2d 567, 569 (C.A.2, 1976); *GAF Corp. v. Milstein*, 453 F.2d 709, 719–20 (C.A.2, 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *Bath Industries, Inc. v. Blot*, 427 F.2d 97, 113 (C.A.7, 1970); *Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1085–86 (C.A.5, 1970).

**4.** See *Kaufman Broad Inc. v. Belzberg*, 522 F.Supp. 35, 41 (S.D.N.Y.1981); *Computer Network Corp. v. Spohler*, [Current] Fed.Sec.L. Rep. (CCH) ¶ 98,623 at 93,087 (D.D.C.1982); *Kirsch Co. v. Bliss & Laughlin Industries, Inc.*, 495 F.Supp. 488, 499 (W.D.Mich.1980); *Schnorbach v. Fuqua*, 70 F.R.D. 424, 442 (S.D. Ga.1975); *Twin Fair Inc. v. Reger*, 394 F.Supp. 156, 161–62 (W.D.N.Y.1975); *Grafic Sciences, Inc. v. International Mogul Mines Ltd.*, [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,834 at 96,806 (D.D.C.1974); *Scott v. Multi-Amp Corp.*, 386 F.Supp. 44, 55–57 (D.N.J.1974);

*Committee for New Management of Butler Aviation v. Norman Widmark*, 335 F.Supp. 146, 155–56 (E.D.N.Y.1971); *Ozark Air Lines v. Cox*, 326 F.Supp. 1113, 1118–19 (E.D.Mo.1971); *Grow Chemical v. Uran*, 316 F.Supp. 891–92 (S.D.N.Y.1970).

**5.** See *Leff v. CIP Corp.*, [Current] Fed.Sec.L. Rep. (CCH) ¶ 98,662 at 93,302–04 (S.D.Ohio 1982) (no implied right of action for shareholders seeking injunctive relief against group including incumbent directors); *Schnell v. Schnall*, [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,927 at 90,715–16 (S.D.N.Y.1981) (shareholder did not have implied private right of action for damages); *American Bakeries Co. v. Pro-Met Trading Co.*, [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,925 (N.D.Ill.1981) (issuer has no implied right of action for injunctive relief because the shareholders, not the issuers, are the intended beneficiaries); *Berman v. Metzger*, [1981 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 97,857 at 90,707–08 (D.D.C. 1981) (no implied right of action for damages); *Gateway Industries Inc. v. Agency Rent A Car Inc.*, 495 F.Supp. 92, 100 (N.D.Ill.1980) (issuer has no implied right of action for injunctive relief); *Sta-Rite Industries Inc. v. Nortek Inc.*, 494 F.Supp. 358, 362–63 (E.D.Wis.1980) (issuer has no implied right of action for injunctive relief).

action exists for shareholders seeking injunctive relief pursuant to Section 13(d).

Implying a private right of action has long been recognized as a means of effectuating the overall goals of a statute. The Supreme Court first invoked the doctrine in *Texas and Pacific Railway Co. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916), holding that an injured railroad worker had an implied private right of action to sue his employer for damages under the Federal Safety Appliance Act. For the next fifty years federal courts applied a relatively simple test to determine whether a private party had an implied remedy under a statutory scheme: "If a statute was enacted for the benefit of a special class, the judiciary normally recognized a remedy for members of that class." *Merrill Lynch Pierce Fenner & Smith, Inc. v. Curran,* ── U.S. ──, ──, 102 S.Ct. 1825, 1837, 72 L.Ed.2d 182 (1982). Applying this test, the federal courts regarded the denial of a remedy as the exception rather than the rule. *Id.*

In the landmark decision of *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the Supreme Court held that an implied cause of action for damages existed in favor of shareholders for losses resulting from deceptive proxy solicitations in violation of Section 14(a) of the Exchange Act. The Court's recognition of an implied right of action resulted from the application of the relatively simple test espoused in *Rigsby.* In this respect, the Court ruled that the purpose of the statute was to protect the investors and that private enforcement of the statute, and rules and regulations promulgated pursuant to that statute, provided "a necessary supplement" to the Securities and Exchange Commission action. *Id.* at 432, 84 S.Ct. at 1560. Thus, finding that the shareholders were the intended beneficiary of the statutory provisions, the Court held that they were entitled to maintain their derivative action for proxy violations against the management of the corporation.

Subsequent to *Borak* and prior to 1975, the Supreme Court generally applied the *Rigsby* approach.[6] It did, on occasion, refuse to recognize that an implied private cause of action existed "either because the statute in question was a general regulatory prohibition enacted for the benefit of the public at large, or because there was evidence that Congress intended an express remedy to provide the exclusive method of enforcement." *Merrill Lynch,* ── U.S. at ──, 102 S.Ct. at 1838, *citing to T.I.M.E. Inc. v. United States,* 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959); *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). Significantly, however, the Court did not find Congressional silence or ambiguity to be an important reason for denying a remedy to a member of the class for which a statute was enacted to protect. *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967).

In 1975, however, the Supreme Court modified its approach to the question whether a statute includes a private right of action. In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Court rejected the claim that a private cause of action existed for a violation of a criminal statute which had never been held to include a private remedy. In so doing, the Court did not apply the simple *Rigsby* test, but announced four factors relevant to the question whether a statute includes a pri-

---

**6.** For a discussion of the Supreme Court's approach to the implied private cause of action, see Note, *Implied Rights of Action in Federal Legislation: Harmonization Within the Statutory Scheme,* 1980 Duke L.J. 928.

vate right of action, one of which included the intent of Congress.[7]

Subsequently, the Court applied the "*Cort* factors" to deny private rights of action under various statutory schemes. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (Trade Secrets Act); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (Indian Civil Rights Act); *Piper v. Chris-Craft Industries Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (Williams Act). In each of these cases, the Court employed one or more of the *Cort* factors, but nevertheless followed the flexible approach set forth in *Cort.* In *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), however, the Court held that an implied cause of action existed but in so doing moved toward a more restrictive test whereby legislative intent came to subsume the other *Cort* factors. Frankel, *Implied Rights of Action,* 67 Va.L.R. 553, 560 (1981).

The restrictive attitude displayed by the Court in *Cannon* was · reemphasized in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979):

> It is true that in *Cort v. Ash,* the Court set forth four factors that it considered "relevant" in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress in-

tended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose, see 422 U.S., at 78 [95 S.Ct. at 2088]—are ones traditionally relied upon in determining legislative intent.

*Id.* at 568, 99 S.Ct. at 2485. The *Touche Ross* Court went further and declared that it was "reluctant to imply a cause of action ... that is significantly broader than the remedy that Congress chose to provide." [8]

Recently, the Supreme Court in *Merrill Lynch* once again reaffirmed the basic principles articulated in *Cannon* and *Touche Ross*—that the focus must be on the intent of Congress. —— U.S. at ——, 102 S.Ct. at 1839. In addition, and perhaps more importantly, the Court attempted to provide a mode of analysis for ascertaining Congress' intent. It noted that when the statute is silent on whether there is an implied cause of action, the starting point "must be on the state of the law at the time the legislation was enacted." If the legislation is new, the question is whether Congress intended to create a remedy to supplement any express enforcement provision. If Congress, however, is amending a statute which has already been held by the judiciary to include a private cause of action, the inquiry is different—the question is whether Congress intended to preserve the preexisting remedy.[9]

---

**7.** The first factor is whether the plaintiff is "one of the class for whose especial benefit the statute was enacted." The second factor is whether Congress intended, either expressly or implicitly to create or deny such a remedy. The third factor is whether the cause of action is consistent with the underlying purposes of the legislative scheme. The final factor is whether the implied cause is one traditionally relegated to state law, in an area basically the concern of the state.

**8.** The restrictive approach articulated in *Touche Ross* was reaffirmed in *Transamerica Mortgage Advisors Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), and refined the restrictive approach when it stated that the "elemental canon of statutory construction [is] that where a statute expressly

provides a particular remedy or remedies, a court must be chary of reading others into it." *Id.* at 19, 100 S.Ct. at 247.

**9.** The Court stated that Congress is presumed to know the state of the law and to adopt it when it reenacts a statute without change. —— U.S. at —— n. 66, 102 S.Ct. at 1841 n. 66. It noted that the Court in *Cannon* applied this principle:

> In *Cannon v. University of Chicago,* we observed that "[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law." 441 U.S., at 696–697 [, 99 S.Ct. at 1957–58]. In considering whether Title IX of the Education Amendment of 1972 included an implied private cause of action for damages, we assumed that the legislators were familiar with the

Accordingly, the Court analyzed the statute in *Merrill Lynch* in this fashion. It found that the statute under analysis had been amended and that prior to this reenactment the courts had recognized that an implied private right of action existed. It thereby concluded that Congress intended to preserve the implied remedy:

> In view of the absence of any dispute about the proposition prior to the decision of *Cort v. Ash* in 1975, it is abundantly clear that an implied cause of action under the CEA was a part of the "contemporary legal context" in which Congress legislated in 1974. Cf. *Cannon v. University of Chicago,* 441 U.S. at 698–699 [, 99 S.Ct. at 1958]. In that context, *the fact that a comprehensive reexamination and significant amendment of the CEA left intact the statutory provisions under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that remedy.* A review of the legislative history of the statute persuasively indicates that preservation of the remedy was indeed what Congress actually intended.

*Id.* at ——, 102 S.Ct. at 1841 (emphasis added).

With this latest pronouncement by the Supreme Court, this Court must look to the intent of Congress when it enacted and reenacted Section 13(d). This Court thus will first examine the statute as it was enacted in 1968. It will then consider the contemporary legal context in which Congress legislated the amendments of 1970 and 1977. Finally, it will evaluate the ex-press legislative history of the 1977 amendments.

SECTION 13(d)

Section 13(d) was enacted in 1968 as part of the Williams Act amendments to the Exchange Act. This section requires any person who acquires more than five percent of a class of any equity security registered under the Act to send a statement containing certain information to the issuer, to each stock exchange where the security is traded, and to the Securities and Exchange Commission. The purpose of Section 13(d) is to provide shareholders and potential investors with information about a change in ownership and control of the issuer to enable them to make informed investment decisions. S.Rep. No. 550, 90th Cong. 1st Sess. 7 (1967); H.R.Rep. No. 1711, 90th Cong. 2d Sess. 8, *reprinted in* [1968] U.S. Code Cong. & Ad.News 2811–12.[10]

The Williams Act, however, did not provide "a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts." *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975). Congress recognized that the potential for changes in control might be beneficial to the corporation and its shareholders by providing a check on "entrenched but inefficient management." *Id.* at 58–59, 95 S.Ct. at 2075–76. In providing the means for the dissemination of information regarding such a change, Congress explicitly sought to avoid tipping the regulatory balance in favor of either management or potential acquirers while also granting both groups

judicial decisions construing comparable language in Title VI of the Civil Rights Act of 1964 as implicitly authorizing a judicial remedy, notwithstanding the fact that the statute expressly included a quite different remedy. We held that even under the "strict approach" dictated by *Cort v. Ash,* "our evaluation of congressional action in 1972 must take into account its contemporary legal context." *Id.,* at 698–699 [, 99 S.Ct. at 1958]. See *California v. Sierra Club,* 451 U.S. 287, 296 n. 7 [, 101 S.Ct. 1775, 1780 n. 7, 68 L.Ed.2d 101] (1981).

*Id.*

**10.** Congress enacted the Williams Act to fill a gap in the existing federal securities laws, which allowed large accumulations of an issuer's shares and cash tender offers to be accomplished in complete secrecy, by requiring disclosure similar to that required in connection with proxy contests and exchange offers. A person who must file pursuant to Section 13(d) must file a Schedule 13D with the SEC and must disclose the purchaser's identity and background, purpose in acquiring the stock, source of financing, extent of acquisition and arrangements or contracts with other persons concerning the stock.

equal opportunities to present their views. *Id.*

As previously stated, Section 13(d) does not create an express private right of action for violations of its provisions. Both Torray Clark and the Jacobs Group agree that the legislative intent of Section 13(d) is of fundamental importance to determine whether Congress intended to create a private cause of action. Torray Clark argues that the determination of legislative intent involves analysis of three factors: the language of the statute, its legislative history, and its place in the legislative scheme. (D.I. 28 at 14.) Torray Clark relies upon *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), wherein the Supreme Court refused to recognize a private cause of action under Section 17(a) of the Exchange Act. In *Touche Ross,* the Court found that Section 17(a) requires broker-dealers to keep records and file them as the Commission may prescribe, and that Section 17(a) did not expressly create a private cause of action. It noted that while other cases had implied a private cause of action from other statutory provisions, that such provisions prohibited certain conduct or created federal rights in favor of private parties. By contrast, the Court found that Section 17(a) "neither confers a right on private parties nor proscribes any conduct as unlawful."

Torray Clark contends that Section 17(a) and 13(d) are "absolute parallels" and that the rationale underlying the *Touche Ross* decision is applicable to this action. In this respect, Torray Clark points out that both Sections 13(d) and 17(a) are simply reporting provisions and are titled as a reporting statute and that both require that in certain circumstances individuals shall file with the SEC information that is necessary or appropriate which is in the public interest or for the protection of investors.

Torray Clark also contends that the enforcement scheme of the Exchange Act demonstrates that Congress expressly provided remedies for violation of Section 13(d) elsewhere in the Act. It asserts that under Section 18 of the Exchange Act, a purchaser or seller of securities can sue for damages if he relies upon material omissions or misstatements in Schedule 13D's proxy materials, or other documents filed with the SEC under the Exchange Act. Torray Clark argues that this fact, along with the fact that Sections 9, 16, 18 and 20 of the Exchange Act provide for a private cause of action, "strongly negates any inference that Congress intended to create an implied private remedy under Section 13(d)." (D.I. 28 at 16.) Thus, Torray Clark maintains that these factors indicate that Congress did not intend to create a private cause of action. Although these factors are relevant when determining whether Congress intended to create a private cause of action, two other considerations are relevant in making this determination: the "contemporary legal context" in which Congress legislated and the express legislative history of the Act.

## CONTEMPORARY LEGAL CONTEXT IN 1968

In 1968, the courts were more likely to imply a private cause of action than they are today. *See e.g. Borak, supra.* The Jacobs Group argues that this liberal judicial approach to implied private rights of action was the "contemporary legal context" in which Congress enacted the Williams Act and that Congress thus intended for the courts to continue to imply such a cause. The Court must reject this argument because the Supreme Court has indicated that before courts may imply a cause of action based on the contemporary legal context in which Congress enacted a statute, they must find judicial interpretation of the specific statutory provisions in question. The mere fact that the Supreme Court was more likely to imply a cause of action is insufficient. *See e.g. Piper v. Chris-Craft Industries,* 430 U.S. 1, 31–32, 97 S.Ct. 926, 944, 51 L.Ed.2d 124 (1977); *Walck v. American Stock Exchange Inc.,* 687 F.2d 778 (C.A.3, 1982).

## CONTEMPORARY LEGAL CONTEXT OF THE 1970 AMENDMENTS

In 1970, Congress significantly amended Section 13(d) by lowering the percentage of

stock of a corporation owned by a person necessary to trigger the Act's provisions from ten percent to five percent and including the equity securities of insurance companies within the coverage of the Act. Act of Dec. 22, 1970, Pub.L. No. 91–567, 84 Stat. 1497. Prior to these amendments, at least five lower courts recognized that an implied right of action existed under Section 13(d) [11] and no court, in a reported opinion, refused to recognize a private cause of action under that section.

Consequently, the Jacobs Group argues that judicial recognition of an implied private cause of action under Section 13(d) was a part of the "contemporary legal context" in which Congress legislated the amendments to Section 13(d) in 1970. Jacobs, however, acknowledges that there was no express legislative history indicating whether Congress intended to grant an implied cause of action. Thus, if this Court is to imply a private cause of action, based solely on the 1970 amendments, it must do so on the presumption that Congress knew the state of the law in 1970 and that by reenacting the statute, with significant amendments, it intended to incorporate implicitly the judicial interpretations of Section 13(d). This Court, however, need not decide this question because in 1977, Congress again enacted amendments to Section 13(d).[12]

## CONTEMPORARY LEGAL CONTEXT OF THE 1977 AMENDMENTS

In 1977, Congress enacted the Foreign Corrupt Practices Act which amended Section 13(d) to require those persons who must file reports with the SEC when they own more than five percent of the shares in a United States company to identify their residence, citizenship, and the nature of their beneficial ownership. Further, Congress enacted Section 13(g) to provide for the development of a comprehensive system for gathering and disseminating information about ownership interests in publicly held companies. See S.Rep. No. 114, 95th Cong. 1st Sess. (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 4098, 4100. At the time of the enactment of the amendments, several circuit courts and district courts had either expressly or implicitly recognized that a private cause of action existed under Section 13(d) [13] and no court held that one did not exist.

**11.** *See GAF Corp. v. Milstein,* 453 F.2d 709 (C.A.2, 1971); *Bath Industries Inc. v. Blot,* 427 F.2d 97, 113 (C.A.7, 1970); *Committee for New Management of Butler Aviation v. Norman Widmark,* 335 F.Supp. 146, 155–56 (E.D.Mo. 1971); *GAF Corp. v. Milstein,* 324 F.Supp. 1062, 1073 (S.D.N.Y.1971); *Grow Chemical Corp. v. Uran,* 316 F.Supp. 891–92 (S.D.N.Y. 1970). The leading case decided prior to the enactment of the 1970 amendments to Section 13(d) was *GAF Corp. v. Milstein, supra,* 453 F.2d at 709. In *GAF,* the court held that an issuer has standing to seek injunctive relief against a shareholder who allegedly made a false and misleading filing. The court stated:

The Milsteins do not contend, with good reason, that there is no private right of action under section 13(d). The teachings of *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), are part of the ABC's of securities law. Nor do the Milsteins challenge the standing of GAF as an issuer.

**12.** There is no question that the 1970 amendments included significant changes and in this respect may be analogous to *Merrill Lynch, supra,* —— U.S. at ——, 102 S.Ct. at 1841. But, the amendments and the "contemporary legal context in which Congress legislated" are distinguishable from the history surrounding the reenactment of the Commodities Exchange Act ("CEA"), the Act that the Supreme Court in *Merrill Lynch* analyzed in depth. First, the amendments to the CEA involved a comprehensive reexamination of the entire Act, while the amendments to Section 13(d) were not as comprehensive. Second, the judicial interpretation of the CEA was more firmly established than the judicial interpretation of Section 13(d). Nevertheless, the Court need not decide whether the 1970 amendments were as significant as *Merrill Lynch* envisioned and whether the rationale underlying *Merrill Lynch* is applicable because Congress amended and reenacted Section 13(d) in 1977.

**13.** *See General Aircraft v. Lampert,* 556 F.2d 90, 96 (C.A.1, 1977); *Missouri Portland Cement Co. v. H.K. Porter Co.,* 535 F.2d 388, 397 (C.A.8, 1976); *Stecher-Traung-Schmidt Corp. v. Self,* 529 F.2d 567, 569 (C.A.2, 1976); *GAF Corp. v. Milstein,* 453 F.2d 709, 719–20 (C.A.2, 1971); *Bath Industries Inc. v. Blot,* 427 F.Supp. 97, 113 (C.A.7, 1970); *Schnorback v. Fuqua,* 70 F.R.D. 424, 442 (S.D.Ga.1975); *Twin Fair Inc. v. Reger,* 394 F.Supp. 156, 161–62 (W.D.N.Y. 1975); *Grafic Sciences Inc. v. International Mogul Mines Ltd.,* [1974–1975 Transfer Binder]

The Supreme Court has never expressly addressed the issue whether a shareholder may seek injunctive relief for a Section 13(d) violation. However, the Supreme Court in *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), considered the merits of a petition by an issuing corporation for injunctive relief under Section 13(d). In *Rondeau,* the issuing corporation brought suit to enjoin the purchaser from voting his stock and from acquiring additional stock and to compel him to divest himself of stock already purchased. The purchaser had failed to file a Schedule 13D because of his unfamiliarity with the securities laws. When the purchaser learned of his obligation, he filed a truthful Schedule 13D.

The narrow issue addressed on certiorari was whether the "record supports the grant of injunctive relief . . . ." *Id.* at 57, 95 S.Ct. at 2075. The Court answered the question in the negative and held that private litigants must show irreparable harm before they can obtain injunctive relief.

Because of the decision on this issue, the more fundamental question—whether the corporation was entitled to bring the action in the first instance—was not expressly resolved. The Court, in a footnote, stated that the issue of whether a corporation could obtain a decree to enjoin a sharehold-er was not being decided. *Id.* at 59 n. 9, 95 S.Ct. at 2076 n. 9. Nevertheless, the Court acknowledged that the corporation was pursuing a cause of action which had "been generally recognized to serve the public interest." [14] *Id.* at 64–65, 95 S.Ct. at 2079. Some courts and commentators have contended that the Supreme Court implicitly held that a private cause of action exists under Section 13(d) [15] especially since *Rondeau* was decided on the same day as *Cort v. Ash, supra,* while others argue that nothing can be inferred from *Rondeau.* [16]

Whether or not the Supreme Court intended to imply that a private cause of action existed under Section 13(d) for a shareholder seeking injunctive relief need not be decided today. The important point is that it did not reverse the judicial interpretations under Section 13(d) which recognized that a private party had a cause of action under that section. Further, in those cases subsequent to *Rondeau* and prior to the 1977 amendments to Section 13(d), the courts continued to recognize that private parties had a private cause of action under Section 13(d). *See e.g. General Aircraft Corp. v. Lampert,* 556 F.2d 90, 96 (C.A.1, 1977); *Missouri Portland Cement Co. v. H.K. Porter Co.,* 535 F.2d 388, 398 (C.A.8, 1976) (both the Courts of Appeals for the

Fed.Sec.L.Rep. (CCH) ¶ 94,834 at 96,800 (D.D. C.1974); *Scott v. Multi-Amp Corp.,* 386 F.Supp. 44, 55–57 (D.N.J.1974); *Committee for New Management of Butler Aviation v. Norman Widmark,* 335 F.Supp. 146, 155–56 (E.D.N.Y. 1971); *Ozark Air Lines v. Cox,* 326 F.Supp. 1113, 1118–19 (E.D.Mo.1971); *Grow Chemical Corp. v. Uran,* 316 F.Supp. 891–92 (S.D.N.Y. 1970).

14. The Court also noted that:

Although neither the availability of a private suit under the Williams Act nor respondent's standing to bring it has been questioned here, this cause of action is not expressly authorized by the statute or its legislative history. Rather, respondent is asserting a so-called implied private right of action established by cases such as *Borak.*

One commentator believes that this passage indicates that the Court considered and accepted the issuing corporation's standing under Section 13(d) to assert an implied injunctive action, though it did not expressly so rule. *See* Note, *Section 13(d) of the Securities Exchange*

*Act: After* Touche Ross *and* Transamerica, *Does an Issuing Corporation Have an Implied Private Cause of Action for Injunctive Relief?* 31 Case W.Res.L.R. 532 (1981).

15. *See Dan River Inc. v. Unitex LTD,* 624 F.2d 1216, 1222 n. 5 (1980); Note, *Section 13(d) of the Securities Exchange Act: After* Touche Ross *and* Transamerica, *Does an Issuing Corporation Have an Implied Private Cause of Action for Injunctive Relief,* 31 Case W.Res. 532, 542 (1981); Note, *Implied Private Rights of Action for Equitable Relief Under Section 13(d) of Williams Act,* 1981 Utah L.Rev. 869, 872; Note, *Section 13(d) of the '34 Act: The Inference of a Private Cause of Action for a Stock Issuer,* 38 Wash. & Lee L.Rev. 971, 973 n. 19 (1981).

16. *See* Note, *An Implied Right of Action for Issuers Under Section 13(d) of the Securities Exchange Act of 1934,* 61 B.U.L.Rev. 933, 949 n. 93 (1981).

First and Eighth Circuit found no irreparable injury after finding a violation).

Thus, when Congress enacted the 1977 amendments, a judicially recognized implied cause of action under Section 13(d) was a part of the "contemporary legal context." As the Supreme Court has noted in a reenactment situation, "Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the preexisting remedy." *Merrill Lynch, supra,* —— U.S. at ——, 102 S.Ct. at 1839. In such a case, Congress is presumed to be aware of the judicial interpretation and to adopt that interpretation when it reenacts the statute without change. *Id.* at —— n. 66, 102 S.Ct. at 1841 n. 66. Of course, this presumption is rebuttable if the legislative history indicates that Congress intended to change the judicial interpretation.

In the legislative history of the 1977 amendments, there are five instances where the existence of a private right of action under the federal securities law is discussed. The first two instances occurred during the Hearing before the Subcommittee on *Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce,* 95th Cong. 1st Sess. (April 20, 1977) ("Hearings before the House Committee"). One reference was made in a written report submitted by an Ad Hoc Committee on Foreign Payments which was formed at the suggestion of the President of the Association of the Bar of the City of New York. It noted that a private cause of action did not exist under Section 13(a) directly and "that those private parties aggrieved must rely on Section 18(a), which gives a right of recovery to a purchaser or seller who relies on misleading statements of a material fact contained in the Section 13 filings or in any other material filed pursuant to the 1934 Act." Hearings before the House Committee at 87. Nevertheless, the Ad Hoc Committee believed that private suits were beneficial to police the violators of the federal securities law so long as the shareholders proved irreparable injury:

Of course, shareholder suits protect the private interests of the corporation and its shareholders rather than the public at large. It must be recognized that fundamental to such actions is a showing of harm to the corporation or its shareholders, or both, which may or may not also represent harm to the broader national interest. That is not to downgrade the importance of private suits. Stockholders and the corporation have important, legitimate interests at stake in the area of foreign payments which are not fundamentally different from their interests with respect to other types of activity which management may choose to engage in or avoid. With foreign payments as with other conduct, the corporation has an interest in having loyal management, in avoiding the waste of its assets, in avoiding activities which may subject it to civil or criminal liability and in avoiding conduct which threatens its business generally. In their individual capacity, shareholders and other investors have an interest in being treated fairly by management and in receiving information material to their investment and voting decisions. *Insofar as the shareholder's suit has been a successful vehicle for protecting the corporation and shareholders in the context of other types of wrongful conduct by management, it should also serve to redress injuries to the corporation resulting from improper foreign payments.*

*Id.* at 27–28 (emphasis added).

The second reference to an implied right of action was made in a Report submitted by the Honorable Harold M. Williams, Chairman, on Behalf of the Securities and Exchange Commission. When discussing the state-of-mind requirement of the proposed amendment to Section 13(d), Chairman Williams noted that "it has been suggested that the Commission, or a private plaintiff in an implied action, ought to be required to show that any deception of auditors or falsification of accounting records was knowingly committed." *Id.* at 221. This statement indicates that the SEC, an agency in charge of the enforcement of the

provisions of Section 13(d), assumed that a private cause of action existed.

These written statements, however, are of limited value when attempting to determine the legislative intent:

> Remarks of this kind made in the course of legislative debate or hearings other than by persons responsible for the preparation or the drafting of a bill are entitled to little weight. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 204 n. 24 [96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668] (1976).

*Piper v. Chris-Craft Industries,* 430 U.S. 1, 31, 97 S.Ct. 926, 944, 51 L.Ed.2d 124 (1977.) Nevertheless, these written statements do provide some weight as to the legislative intent, and indicate that the issue was affirmatively presented to the House when the legislators were considering the amendments to Section 13(d). They take on additional importance, however, when the House Committee on Interstate and Foreign Commerce expressly resolved the private cause of action issue. *See* H.R.Rep. 640, 95th Cong. 1st Sess., Unlawful Corporate Payments Act of 1977, *reprinted in* 13172–11 House Misc. Reports on Public Bills XI at 10. The House Report states:

> The Committee intends that the courts recognize a private cause of action based on this legislation, as they have in cases involving other provisions of the Securities Exchange Act, on behalf of persons who suffer injury as a result of prohibited corporate bribery. The recognition of such a private cause would enhance the deterrent effect of this legislation and provide a necessary supplement to the enforcement efforts of the Commission and the Department of Justice.

This Committee Report, which, by definition, reflects the view of the entire committee, must be accorded substantial weight.[17]

The only other references to a private cause of action occurred immediately preceding the passage of the Foreign Corrupt Practice Act. Although Senator Tower concurred with the Conference Committee's overall bill, he stated that:

> [t]he House report states it is expected that the courts will recognize implied private right of action under the criminalization sections of the bill. This question was not considered in the Senate or during the conference, and thus cannot be said that any intent is expressed at all on this issue. In view of the existing case law, it is difficult to conceive that the courts would imply a cause of action in any event. Nevertheless, because of the gratuitous statement in the House report, I feel I should state my understanding that neither the Senate nor the conferees expressed any opinion on this issue.

123 Cong.Rec. S 19401 (daily ed. Dec. 6, 1977) (statement of Sen. Tower). Congressman Devine likewise stated that he "want[ed] to point out that the Conference Committee report vests enforcement responsibility in the SEC and Justice Department and the conferees did not intend to create a private right of action. 123 Cong. Rec. H 12825 (daily ed. Dec. 7, 1977) (statement of Rep. Devine). Although these statements were made by conferees of the final bill and are entitled to some weight, the Court finds that they are not entitled to overrule the statement of an entire Congressional Committee. The Conference Report states in detail the differences between the House and Senate Bill, but fails to discuss the private cause of action issue. If the Committee for Conference did not agree with the House Report with respect to private cause of actions, then it could have easily stated so.

■ Based on the discussion above, the Court concludes that the Congress intended to preserve a private cause of action which had been judicially created.

---

17. The Senate Committee on Banking, Housing and Urban Affairs, the Committee which conducted hearings and authored the Senate's Bill, did not expressly address the private cause of action issue, *see* Hearing before the Committee on Banking, Housing, and Urban Affairs on Foreign Corrupt Practices and Domestic and Foreign Investment Disclosure, 95 Cong. 1st Sess. (1977); S.R. 114 *reprinted in* 13168–2 Senate Misc. Reports on Public Bill II, nor did the Committee for Conference expressly address the issue in a reported document.

Having determined that an implied cause of action exists under Section 13(d) and 13(g), the Court must now determine whether the Jacobs Group, as shareholders, has standing to bring the action against Torray Clark, an investment adviser seeking injunctive relief. The legislative history clearly illustrates that the intended beneficiaries of the statute were the shareholders, therefore, if any person has standing, it is the shareholder seeking injunctive relief. The question remains, however, whether the Jacobs Group may be granted injunctive relief against an investment adviser such as Torray Clark.

FIRST CAUSE OF ACTION

As previously noted, Section 13(d) requires that a comprehensive report be filed with the SEC by any person who after acquiring securities of the class is the beneficial owner of more than 5% of the class. The public report must be made within ten days after that acquisition. Rule 13d–1(b)(1), 17 C.F.R. § 240.13d–1(b)(1) (1980), however, provides an exception to this general reporting requirement. If an investment adviser has acquired securities of a corporation in the ordinary course of business, and not with the purpose nor with the effect of changing or influencing the control of the corporation, then it need not file a Schedule 13D, but may file a less comprehensive Schedule 13G.

Jacobs' first cause of action recognizes that Torray Clark is a registered investment adviser, that its business is to buy, sell and hold securities for its clients with a view to achieving the investment objectives of its clients and that Torray Clark does not ordinarily buy and hold securities in a man-

ner to influence the control or management decisions of the companies in which it invests. (D.I. 51, ¶ 14.) The Jacobs Group, however, alleges that Torray Clark held Pabst common stock not in the ordinary course of its business, but with the purpose, intent and effect of changing or influencing control of Pabst, or for the purpose of causing Pabst to make an extraordinary corporate transaction, such as a merger, which would effectively change control of the issuer and that Torray Clark, therefore, was required to file a Schedule 13D with the SEC disclosing its intention.[18]

The Jacobs Group further alleges that Torray Clark has never filed a Schedule 13D with the SEC and that the proxies received from Torray Clark in favor of management's slate of nominees were voted at the annual meeting in violation of Section 13(d) of the Exchange Act and the rules promulgated thereunder. (D.I. 51, ¶ 27.) Specifically, they claim that Rule 13d–1(b)(3)(ii), 17 C.F.R. § 240.13d–1(b)(3)(ii) (1980), promulgated by the SEC precludes Torray Clark from voting or directing the vote of any shares for the ten-day period immediately following the date of filing a Schedule 13D, disclosing its intention to effect a change in control of an issuer. (D.I. 51, ¶ 16.) The Jacobs Group contends that Pabst is threatened with immediate and irreparable injury unless this Court intervenes by the entry of an order voiding the proxies received by management from Torray Clark. (D.I. 51, ¶ 27.)

Torray Clark argues that the first cause of action should be dismissed because this Court may not, as a matter of law, disenfranchise Torray Clark's right to direct the

---

**18.** Rule 13d–1(b)(3)(i), 17 C.F.R. § 240.13d–1(b)(3)(i) (1980) provides:

[A] person shall immediately become subject to Rules 13d–1(a) and 13d–2(a) and shall promptly, but not more than 10 days later, file a statement on Schedule 13D if such person:

(A) Has reported that it is the beneficial owner of more than five percent of a class of equity securities in a statement on Schedule 13G pursuant to paragraph (b)(1) or (b)(2), or is required to report such acquisition but has not yet filed the schedule;

(B) Determines that it no longer has acquired or holds such securities in the ordinary course of business or not with the purpose nor with the effect of changing or influencing the control of the issuer, nor in connection with or as a participant in any transaction having such purpose or effect, including any transaction subject to Rule 13d–3(b) (§ 240.13d–3(b)); and

(C) Is at that time the beneficial owner of more than five percent of a class of equity securities described in Rule 13d–1(c).

**1064**

vote of Pabst common stock. Torray Clark primarily relies upon *General Aircraft Corp. v. Lampert,* 556 F.2d 90 (C.A.1, 1977), where the court affirmed a grant of injunctive relief which barred further violations of Section 13(d), but reversed the district court's injunction against defendants' voting of their shares, despite evidence that the defendants had acquired 12% of GAC's stock in a single day, had failed for three months thereafter to file a Schedule D, and had made false disclosures about their "investment" purpose when they finally filed a Schedule 13D. The court found that no irreparable harm resulted from the alleged Section 13(d) violations and that sterilization of voting shares would act as a punishment rather than as an effective deterrent. Nevertheless, the court expressly noted that sterilization of voting shares "may be appropriate" in some circumstances. *Id.* at 97. Therefore, *General Aircraft* does not support Torray Clark's position.

█ Thus, this Court cannot hold, as a matter of law, that it is without equitable power to disenfranchise Torray Clark's right to direct the vote. Rather, this Court holds that it has broad discretionary power to remedy violations of the federal securities law, and if it finds that Torray Clark violated Section 13(d) and that such violation caused the Jacobs Group irreparable harm, it has the power to fashion an equitable remedy designed to fit the injury, including disenfranchisement.

In addition, to its traditional equitable power, this Court has the power to disenfranchise Torray Clark's ability to direct the vote pursuant to Rule 13d–1(b)(3)(ii), 17 C.F.R. § 240.13d–1(b)(3)(ii) (1980), which provides:

> For the ten day period immediately following the date of the filing of a Schedule 13D pursuant to this paragraph (b)(3), such person shall not: (A) Vote or direct the voting of the securities described in paragraph (b)(3)(i)(A); nor, (B) Acquire an additional beneficial ownership interest in any equity securities of the issuer of such securities, nor of any person controlling such issuer.

Torray Clark argues that Rule 13d–1(b)(3)(ii) "is a recently adopted rule whose unclear language and uncertain application have not been elucidated by judicial interpretation." (D.I. 28 at 25.) The Court fails to see the unclear language nor any ambiguities in the Rule. The Rule expressly states that a person who was exempt from filing a Schedule 13D because of Rule 13–d(1)(b)(3)(i), but is no longer exempt because of a change in circumstances, may not vote or direct the voting of the securities for a ten day period. Therefore, the Jacobs Group may proceed against Torray Clark on its first cause of action.

SECOND CAUSE OF ACTION

The Jacobs Group, in its second cause of action, alleges that Torray Clark repeatedly notified the management of Pabst and members of the Jacobs Group of its ability to direct the votes of its clients as a block for either the Revitalization Committee or for Pabst management and that Torray Clark and its clients who owned Pabst common stock constituted a group by virtue of having agreed to act together for the express purpose of voting the Pabst shares. (D.I. 51, ¶¶ 31 & 32.) They further assert that Torray Clark failed to comply with Section 13(d) and Rule 13d–3 which required Torray Clark to file a Schedule 13D with the SEC disclosing its group status and identifying the members of the group and disclosing other information, including the purpose of the investment, the source of any financing and their plans with respect to Pabst. Finally, the Jacobs Group alleges that they are threatened with immediate and irreparable injury unless the Court intervenes by the entry of an order voiding the proxies received from Torray Clark. *Id.,* ¶¶ 33–36.

Torray Clark argues that this second cause of action should be dismissed because a collective decision or agreement by an investment adviser and its retirement trust clients that shares held by such clients should be voted in a given manner represents conduct in the ordinary cause of their respective businesses which Section 13(d) was not intended to prohibit. (D.I. 25 at

31–33.) Torray Clark advances two arguments to support this proposition.

First, Torray Clark argues that Section 13(d) does not apply to activity confined to the voting of shares. It notes that Section 13(d)(3) provides that "[w]hen two or more persons act as a . . . group for the purpose of acquiring, holding or disposing of securities of an issuer," the group is deemed to be a "person" subject to the disclosure requirements of Section 13(d). *See* Section 13(d)(3). Torray Clark thereby argues that Section 13(d) deals only with concerted action among two or more parties directed toward the purchase, retention or sale of securities and that the proxy rules do not prohibit agreements between an investment adviser and its clients concerning the voting of shares. Therefore, it argues that the requirement for Section 13(d)(3) liability cannot be met by an agreement between parties as to the voting of proxies. (D.I. 28 at 37.) The Court rejects this argument because Rule 13d–5(b)(1) expressly provides that a group is formed when two or more persons agree to act for the purpose of voting shares:

> (b)(1) When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of Sections 13(d) and 13(g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

Torray Clark also contends that even if Section 13(d) were to apply to group voting, actions taken with respect to the voting of securities by an investment adviser and its clients in the ordinary course of the investment adviser's business do not constitute "group" activity within the meaning of Section 13(d). It notes that as a registered investment adviser managing large discretionary accounts, Torray Clark is responsible on a daily basis for making decisions concerning the purchase and sale of securities held in such accounts and for rendering advice to its clients on other matters—including the voting of shares in corporate elections—affecting their investments. Torray Clark asserts that an investment adviser cannot, as a practical matter, carry out its normal activities and responsibilities if its diligent gathering of the necessary information on which to base its voting advice and its discussion with or recommendations to its clients based on such information could expose the adviser or its clients to liability under Section 13(d)(3) as members of a group. (D.I. 28 at 33.) Torray Clark primarily relies upon two district court cases to support its argument: *National Home Products Inc. v. Gray,* 416 F.Supp. 1293 (D.Del.1976); and *Camelot Industries Corp. v. Vista Resources Inc.,* 535 F.Supp. 1174 (S.D.N.Y.1982).

In *National Home Products,* the issuer corporation alleged that a shareholder, a broker, a brokerage firm and others constituted a Section 13(d)(3) group. The court found no evidence to indicate that the parties reached an agreement to act in concert to attempt to control the board or to vote as a cohesive block at the annual meeting, rather, it found that the shareholder simply was seeking advice from her broker "as to how to extricate herself from her unprofitable investment" and the broker simply advised her. *Id.* at 1323. It therefore concluded that no group existed. Likewise, in *Camelot,* the issuing corporation alleged that the tendering corporation and two brokerage firms constituted a group under Section 13(d)(3) and violated the reporting requirement of Section 13(d), when it failed to disclose the existence of the group. The court, as in *National Home Products,* found that there was "no statement, no document, and no testimony to establish a common purpose in connection with the tender offer, whatever the silent conviction of the individuals may have been" and that no group existed.

*National Home Products* and *Camelot,* therefore, stand for the proposition that if the parties have not *agreed* to act, then a group does not exist. Torray Clark's reliance upon these cases is, therefore, mis-

placed because the Jacobs Group has expressly alleged that Torray Clark and its clients, who owned Pabst common stock, *agreed to act together for the express purpose of voting Pabst shares.* It is the agreement to act in a concerted manner—to act as a block in order to influence the control of a corporation—that Section 13(d) requires to be disclosed. When the parties do not agree to act in a specified manner, as in *National Home Products* and *Camelot,* then disclosure is not required; but when the parties agree to form a coalition, in order to effect a change or to influence the control of a corporation, as the Jacobs Group has alleged, then the coalition may be deemed to be a group under Section 13(d). Consequently, this Court concludes that the second cause of action should not be dismissed.

## FIFTH CAUSE OF ACTION

[4] The Jacobs Group also alleges that during the annual meeting, in response to questions from shareholders, Pabst represented that the written proxy materials contained all material information necessary for shareholders to cast an informed vote and that no shareholder had been given any information which was not available to shareholders at large. The Jacobs Group contends that these statements were false and misleading and that throughout the proxy contest, Pabst, acting through its directors, officers, employees and agents, repeatedly promised substantial shareholders that if they gave their proxies to management, a new cash offer for all the shares of Pabst in the range of $23 to $25 per share would be forthcoming. The Jacobs Group further alleges that Pabst's predictions of future offers were materially false and mis-

leading when made, and were calculated to influence improperly the vote of Pabst shareholders at the annual meeting because there was no reasonable likelihood at the time such statements were made that Pabst would be receiving shortly a new cash offer for its stock. Finally, the Jacobs Group alleges that Pabst and Torray Clark violated Delaware common law by conspiring to cast proxies received from Torray Clark's clients and others through Pabst's misleading illegal promises. They contend that if the proxies submitted by Torray Clark and others are not voided, and Pabst prevails in the election, they will suffer irreparable injury. Therefore, the Jacobs Group requests that this Court exercise its power pursuant to Section 225 of the General Corporation Law of the State of Delaware to void the proxies which were improperly obtained by Pabst management in violation of Delaware common law.

The Court concludes that the Jacobs Group's amended complaint fails to identify adequately the illegal promises made by Pabst and Torray Clark. The only misstatement or "illegal promise" which is alleged by the Jacobs Group is a statement made by Pabst that if present management were elected "a new cash offer for all the shares of Pabst ... would be forthcoming in the near future." *See* D.I. 51, ¶ 47. There is no allegation, however, that Torray Clark knew that the statement was false and misleading. If the Jacobs Group has attempted to allege that Torray Clark worked with Pabst, as a co-conspirator, to violate Delaware law, it has failed to set forth sufficient facts in the amended complaint to establish the elements of the conspiracy.[19] *See* Rule 9(b), F.R.Civ.P. Conse-

---

19. At oral argument, the Jacobs Group attempted to clarify the fifth cause of action:

Now, the thrust of that claim is again fairly simple. The thrust of it is that Pabst made improper and illegal promises in connection with the vote. The thrust is that Torray Clark knew of these promises and participated in obtaining votes based on those promises.

The state law violation is, in a sense, based on the management's violations of their fiduciary obligations to the stockholders. The

Pabst management, it is alleged, violated their fiduciary duties by making improper promises in connection with the voting.

Torray Clark participated in those fiduciary duty violations and is liable as a participant in a breach of fiduciary duty. It is I think undisputed law that one who participates knowingly in a breach of fiduciary duty is liable for that breach of fiduciary duty. That is the thrust of that claim.

D.I. 66 at 36. The Jacobs Group's theory that Torray Clark is liable as a co-conspirator along

quently, the Court will dismiss the fifth cause of action in the first amended complaint, but will grant leave to amend in order to plead sufficient facts.

SIXTH CAUSE OF ACTION

[5] The Jacobs Group alleges that Torray Clark was an agent in fact and in law with respect to the proxies it received from its investment clients and that it had a fiduciary obligation to its clients to cast every proxy which was not withdrawn or superseded in writing by its clients in the manner specified by the clients. The Jacobs Group claims that Torray Clark breached its fiduciary duty when it failed to vote proxies it received on April 9, 1982, in favor of the Revitalization Committee's slate of directors and that they will suffer irreparable injury unless the Court intervenes by way of an order directing Torray Clark to vote the proxies it received from its clients in favor of the Revitalization Committee. (D.I. 51, ¶¶ 58–61.)

Although an agent has a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency, Restatement (Second) of Agency § 387 (1958), and that certain contractual agreements may create enforceable rights in third parties, *see e.g. Royal Indemnity Co. v. Alexander Industries Inc.,* 211 A.2d 919 (Del.1965); *Wilmington Housing Authority v. Fidelity & Deposit Co.,* 43 Del. 381, 47 A.2d 524 (1946); *Farmers Bank of the State of Delaware v. Howard,* 276 A.2d 744 (Del.Ch.1971), this Court finds that the relationship between an investment adviser and its clients does not confer third-party rights to an insurgent group of shareholders. *See generally* Restatement (Second) of Trusts § 200 (1959). No cases have been cited to this Court to support this proposition, nor has the Court upon its own research been able to find any supporting that argument. The Court, therefore, will dismiss the sixth cause of action. If Torray Clark has violated a duty, the cause of action must be brought by one of its clients.

LACHES AND UNCLEAN HANDS

[redacted] Torray Clark asserts, as affirmative defenses, that the Jacobs Group may not invoke the equitable powers of the Court because it is barred by the doctrine of laches and unclean hands. (D.I. 34, ¶¶ 63–76.) Having had five separate civil actions filed in this Court involving disputes between Pabst and the Jacobs Group during the last five months, which included the granting of two preliminary injunctions based on violation of federal law,[20] this Court is well aware of the hostility between the parties, which has prompted the parties to be perhaps overzealous on the corporate battleground. Nevertheless, in putting aside the respective parties' armor, this Court is unable to rule as a matter of law that the Jacobs Group's claims against Torray Clark must be dismissed under these doctrines. There are too many unresolved issues of fact as to the existence to warrant dismissal based on those doctrines. *See e.g. Bethel v. Jendoco Construction Corp.,* 570 F.2d 1168, 1174 (C.A.3, 1978); 5 Wright & Miller, Federal Practice and Procedure § 1357 at 605–606 (1969).

An order will be entered in accordance with this opinion.

[redacted]

with Pabst on the grounds that Torray Clark was a participant in a breach of fiduciary duty was first advanced at oral argument. Because this issue was not briefed prior to oral argument, the Court considers this argument was not seriously made.

20. In C.A. No. 82–440, the Court preliminarily enjoined the Jacobs Group's tender offer based on probable violations of the antitrust laws. In C.A. No. 82–449, the Court preliminarily enjoined Olympia Brewing Company's tender offer based on probable violations of the federal securities laws. *See* C.A. No. 82–449, D.I. 20, July 21, 1982.