**Sadie RUBIN and Julie Stone, derivatively on Behalf of Pennsylvania Engineering Corporation, Plaintiffs,**

**v.**

**Victor POSNER, Ivan F. Boesky, and Drexel Burnham Lambert, Inc., Defendants,**

**and**

**Pennsylvania Engineering Corporation, Nominal Defendant.**

**Civ. A. No. 87–378–JJF.**

United States District Court,
D. Delaware.

Dec. 21, 1988.

David Berger (argued), Robert Frutkin (argued), and Marc H. Edelson, of Berger & Montague, Philadelphia, Pa., Jeffrey S. Goddess, of Saul, Ewing, Remick & Saul, Wilmington, Del., for plaintiffs.

Lawrence Blatte, of Rosen & Reade, New York City, Jesse A. Finkelstein (argued), Daniel A. Driesbach, and James C. Strum, of Richards, Layton & Finger, Wilmington, Del., for defendant Posner.

Philip D. Anker (argued), and Charles E. Davidon, of Wilmer, Cutler & Pickering, Washington, D.C., James F. Harker, of Herlihy & Wier, Wilmington, Del., for defendant Boesky.

Mathias E. Mone (argued), and David S. Smith, of Cahill, Gordon & Reindel, New York City, Robert K. Payson, of Potter, Anderson & Corroon, Wilmington, Del., for defendant Drexel Burnham Lambert.

Christopher Battaglia, of Biggs & Battaglia, Wilmington, Del., for defendant Pennsylvania Engineering.

## OPINION

FARNAN, District Judge.

## I. INTRODUCTION.

Defendants Victor Posner, Ivan F. Boesky, and Drexel Burnham Lambert, Inc. ("Drexel"), respectively, have filed motions to dismiss this shareholder's derivative action brought on behalf of Pennsylvania Engineering Corporation ("PEC") by plaintiffs Sadie Rubin and Julie Stone ("plaintiffs"). The complaint alleges (1) that Posner and Boesky violated § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5; (2) that Posner, Boesky, and Drexel aided and abetted the alleged § 10(b) and Rule 10b–5 violations; (3) that Posner and Boesky violated § 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d, 17 C.F.R. § 240.13d; (4) that Posner violated §§ 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d); and (5) that Posner and Drexel violated fiduciary duties to PEC and that both Boesky and Drexel aided and abetted Posner's alleged breach. Plaintiffs seek, *inter alia*, damages for the alleged violations.

Defendants contend that the action should be dismissed, asserting (1) that the complaint fails to state a claim upon which relief can be granted pursuant to Fed.R. Civ.P. 12(b)(6); (2) that Fed.R.Civ.P. 23.1 has not been complied with; (3) that the complaint fails to plead fraud with particularity as required by Fed.R.Civ.P. 9(b); and (4) that the Court lacks subject matter jurisdiction over the pendent state law claims.

## II. FACTUAL BACKGROUND AND ALLEGATIONS.

Plaintiffs allege that for all times relevant to this matter they owned shares of common stock of PEC, which is a Delaware corporation engaged in the engineering and construction of steel making and processing facilities, as well as in the design, engineering, and supply of heavy equipment for the steel industry. Defendant Posner is the President, Chairman of the Board, and Chief Executive Officer of PEC, and defendant Boesky is in the business of merger arbitrage. Defendant Drexel is a registered broker dealer and an investment banker.

Prior to August 29, 1980, PEC had acquired a substantial quantity of securities of Fischbach Corporation, reputedly the largest electrical contractor in the United States. On or about August 29, 1980, PEC and Fischbach entered into a "standstill agreement". Fischbach agreed not to object to acquisitions by PEC or its affiliates of up to 24.9% of Fischbach voting securities, and PEC agreed that for ten years neither it nor its affiliates would acquire more than 24.9% of Fischbach voting securities, unless an unrelated third party acquired more than 10% of such securities. In April 1984, PEC brought an action in Florida seeking to have the standstill agreement declared invalid, while Fischbach concurrently brought an action in a different forum seeking to have the agreement upheld.

**1044**

Plaintiffs claim that in April 1984 Posner and Boesky entered into a "secret agreement" whereby Boesky allegedly agreed to purchase Fischbach securities and hold them for Posner. In return, Posner was to reimburse Boesky for any losses resulting from the buying and holding of the securities, and it is this alleged secret agreement that is the subject of this lawsuit.

Boesky eventually purchased 13.4% of Fischbach's voting securities and, accordingly, filed a Schedule 13D and subsequent amendments to it. Plaintiffs allege in their complaint that in these filings Boesky never disclosed the alleged secret agreement with Posner. In the summer of 1984, PEC filed amendments to its Schedule 13D pertaining to Fischbach. PEC also made its regular 10–Q reports to the SEC. Plaintiffs claim that these filings by PEC similarly did not disclose the alleged secret agreement with Boesky.

PEC and Fischbach settled their dispute over the validity of the standstill agreement in January 1985. The settlement provided that Fischbach would not object to PEC acquiring additional Fischbach voting securities.

On February 27, 1985, Fischbach shares closed at $36.375 on the New York Stock Exchange and the market price of Fischbach's 4¾% debentures was approximately 88% of face value. The next day, PEC, through its wholly owned subsidiary, Pennsylvania Acquisition Corporation ("Acquisition"), purchased Fischbach stock at $45.00 per share and the said Fischbach debentures at 98% of the face value from Boesky. Drexel was hired, allegedly for a fee of $3 million, to arrange the financing for the purchase of the Fischbach securities held by Boesky. Drexel placed certain notes, issued by Acquisition and guaranteed by PEC, and PEC sold its own notes in order to finance the Fischbach purchase. In addition, plaintiffs allege that Drexel arranged for PEC's payment of $2.5 million to Boesky which was intended to "make [Boesky] whole" for losses resulting from his alleged role in the scheme.

In March 1985, PEC filed amendments to its Schedule 13D evidencing its purchase from Boesky as well as other transactions involving PEC and affiliated entities, including additional purchases of Fischbach stock and debentures by Acquisition, a purchase of Fischbach stock on the open market by APL Corporation ("APL"), and a transfer of Fischbach securities from PEC to Acquisition. On or about April 23, 1987, Boesky pleaded guilty to a criminal information charging him with making false and fraudulent statements and representations in connection with the aforementioned Schedule 13D statements filed by him.

In May 1987, Posner obtained control of APL. In June 1987, APL and PEC allegedly entered into an agreement with holders of the notes issued to finance the Fischbach transaction whereby APL deposited $40.6 million in escrow (to be paid eventually to the note holders) and PEC transferred all of its Fischbach securities to APL, apparently at the going rate of $21.75 per share (or less than one half the cost to PEC for the Fischbach stock). Plaintiffs allege that the total amount of these securities was less than the $40.6 million escrow amount and that the balance was converted into a secured demand note.

In sum, plaintiffs allege that Posner used PEC for his own economic advantage by causing PEC to purchase Fischbach securities at an inflated price (incurring a substantial debt to pay for the purchase) and then to sell the securities at less than one half the cost to an entity (APL) controlled by Posner. Plaintiffs allege that PEC's loss on just the Fischbach stock transaction exceeds $15 million.

On June 17, 1987, plaintiffs sent a letter to PEC's Board of Directors demanding that the corporation sue Posner for damages arising out of the transactions described here. Plaintiffs allege that the demand letter included information upon which the Board should have instituted suit against Boesky and Drexel. On July 14, 1987, plaintiffs filed this action.

## III. DISCUSSION.

Presently before the Court are defendants' motions to dismiss plaintiffs' complaint. The dominant argument made by

defendants is that plaintiffs' complaint fails to state claims upon which relief can be granted. It is a time-honored maxim that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The question is not whether plaintiff will ultimately prevail on the merits, but rather whether plaintiff is entitled to offer evidence to support the claims made. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Plaintiffs' complaint contains five counts. Because each of the five counts is attacked by one or the other defendants, the Court will address the issues presented in the order in which they flow from the complaint. A more general issue, concerning whether the entire complaint should be dismissed under Fed.R.Civ.P. 23.1, will be discussed first, however.

### A. *Defendants' Motions to Dismiss Under Rule 23.1.*

Defendants contend that plaintiffs' entire complaint should be dismissed for failure to meet the requirements of Fed.R.Civ.P. 23.-1. Specifically, Posner, Boesky, and Drexel argue that the instant suit was filed prematurely—that is, before PEC had a reasonable opportunity to respond to the demand. Additionally, Boesky and Drexel assert that the demand letter is inadequate as against them because it does not request that the board sue either of them, only Posner. For the reasons set forth below, the motions to dismiss will be denied.

■ Rule 23.1 represents a balance between a board's right to control the prosecution of litigation and the shareholders' interest in "policing" the board's obligations of corporate governance. See *Allison v. General Motors Corp.,* 604 F.Supp. 1106, 1112 (D.Del.), *aff'd,* 782 F.2d 1026 (3d Cir.1985). Even after a demand is made, a shareholder can abandon the procedure if the board fails to respond to the demand. *See id.* at 1117.

Posner and PEC concede in their briefs that the June 15 letter adequately demanded that PEC sue Posner, Boesky, PEC and Drexel. Although the actual demand phrase in the letter demands suit only against Posner, the three-page letter describes the alleged scheme between Posner and Boesky and mentions Drexel's alleged role in providing the financing. A demand is adequate if it "identifies the alleged wrongdoers, describes the factual basis of the wrongful acts and the harm caused to the corporation, and requests remedial relief." *Allison,* 604 F.Supp. at 1117. Thus, the Court concludes that the June 15 demand letter meets the requirement of adequacy.

■ The issue of filing suit prematurely after demand, however, is a more difficult one. The June 15 letter was mailed on June 17. The complaint was filed on July 14, approximately one month later. The question whether suit was filed prematurely after demand

> is not how much time is needed to respond to the demand, but whether the time between demand and filing of suit was sufficient to permit the board of directors to discharge its duty to consider the demand. Generally, if demand is required, the amount of time needed for a response will vary in direct proportion to the complexity of the technological, quantitative, and legal issues raised by the demand.

*Id.* at 1117–18.

Other courts have similarly concluded that no magical period of time exists by which to measure whether suit was filed prematurely. *See, e.g., Recchion, Westinghouse Electric Co. v. Kirby,* 637 F.Supp. 1309, 1319 (W.D.Pa.1986) ("no precise rule as to how much time a board must be given to respond to a demand"); *Mozes, General Electric Co. v. Welch,* 638 F.Supp. 215, 220 (D.Conn.1986) ("the standard ... in a particular situation is one of reasonableness under the circumstances").

The principal case on this issue in this district is *Allison.* In that case, the court found that, under the circumstances, a suit

filed 2½ months after demand was made was filed prematurely. But the facts of *Allison* are distinguishable from the ones presented here. In *Allison,* the demand alleged that the braking system in the X cars were defective. 604 F.Supp. at 1118. GM's board was not necessarily knowledgeable about these brake systems and, therefore, had to first develop an understanding of the technological issues involved before evaluating the demand. *See id.* at 1118. More importantly, the GM board affirmatively took action to "discharge its duty to consider the demand". For example, the board responded by letter that the demand would be considered at the next board meeting and later advised plaintiffs' counsel that it was looking into the matter and that further communications would be forthcoming.

In contrast to *Allison,* no complex technological issues are involved here and the board apparently took no action at all between June 15 and July 14. Although the complaint is lengthy, containing five counts and three defendants, the issues it raises are straightforward and revolve almost entirely around the alleged secret agreement between Posner and Boesky. PEC certainly could have responded in some way to plaintiffs' demand, by at least advising them that the matter was under consideration by the board and its counsel. The record fails to indicate that PEC's board did anything in response to plaintiff's demand.

The Court has reviewed cases from other districts in which two months or even eight months have been deemed to be too short for purposes of responding to a demand, but concludes that the factual contexts in those cases are distinguishable from the one presented here. In *Recchion, supra* (2 months), the demand letter named 23 defendants. 637 F.Supp. at 1319. And, in *Mozes, supra* (8 months), the board began to discharge its duty by forming a special litigation committee to investigate the circumstances of a "complex case". 638 F.Supp. at 221. Here, only three defendants are named, no investigation was undertaken by the board, and all the issues

gravitate toward a single alleged agreement between Posner and Boesky.

For these reasons, I conclude that plaintiffs' suit was not filed prematurely, and defendants' motions to dismiss for failure to comply with Rule 23.1 must be denied.

**B.** *The 10b–5 Count Against Posner and Boesky.*

In Count I of the complaint, plaintiffs allege that Posner and Boesky violated § 10(b) and Rule 10b–5 by filing false and misleading financial statements. Plaintiffs claim, *inter alia,* that: the 13D and 10–Q statements did not reveal the alleged "secret agreement" between Posner and Boesky, whereby Boesky was to be reimbursed for any losses resulting from his purchase and holding of Fischbach securities on behalf of Posner; that PEC relied on the truthfulness of the filings; and that had PEC known of the allegedly false and misleading character of the statements, PEC would not have purchased the Fischbach securities from Boesky at the higher price, if at all. Posner and Boesky have moved to dismiss Count I on the grounds that it fails to state a claim upon which relief may be granted. For the reasons set forth below, their motions to dismiss Count I will be denied.

Rule 10b–5 provides a cause of action for "deceptive devices and contrivances in the purchase or sale of securities." *Superintendent of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). It is based on the common law tort action of deceit. *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986). In *Valente v. Pepsico, Inc.,* 454 F.Supp. 1228 (D.Del.1978), this Court set out the elements of a private cause of action for damages under § 10(b) and Rule 10b–5: the alleged misrepresentations or omissions must be material; there must be a causal relationship between the alleged violation and the alleged injury; and the defendant must act with scienter. *Id.* at 1236. To establish the causation element, a plaintiff must prove a relationship between the alleged fraudulent misrepresentations or omissions and the purchase or sale of a

security; that the alleged violations induced the plaintiff to purchase the security ("transaction causation"); and that the misrepresentations or omissions caused the plaintiffs pecuniary loss ("loss causation"). *Bradford–White Corp. v. Ernst & Whinney*, C.A. No. 83–3371, slip op. at 14 n. 13 (E.D.Pa. Aug. 25, 1987) [available on WESTLAW, 1987 WL 16316].

▊ Posner focuses on the "loss causation" element and asserts that plaintiffs have not alleged and cannot prove that the alleged fraud caused any loss to PEC. Posner argues that PEC knowingly paid a premium for the Fischbach securities and knowingly sold them later at half their cost. Thus, Posner concludes that PEC's own investment decision and shifting market forces, not the allegedly fraudulent filings, caused PEC's loss.

An economic loss resulting from alleged misrepresentations and omissions is exactly what the complaint alleges. Although Posner may ultimately convince a trier of fact that plaintiffs have not proved loss causation, it has been adequately alleged and plaintiffs must be given an opportunity to prove it at trial. Therefore, Posner's motion to dismiss Count I will be denied.

▊ Boesky moves to dismiss Count I on two grounds. First, he incorporates by reference Posner's loss causation argument, and for the reasons stated, that argument cannot prevail. Second, Boesky argues that plaintiffs do not and cannot properly plead that Boesky's 13D statements deceived PEC because Posner's knowledge of any alleged misrepresentation or omission must be imputed to PEC, at least as far as any 10b–5 claim against Boesky is concerned.

In *Pappas v. Moss*, 393 F.2d 865 (3d Cir.1968), the court refused to impute knowledge of directors to the corporation where the board allegedly caused the corporation to sell stock at a fraudulently low price. In *Pappas*, defendant directors had argued that "[a] corporation can act only through its agents; all of its agents (directors) here were aware of the true facts, ergo, the corporation was not deceived." *Id.* at 869. The Court of Appeals for the

Third Circuit rejected defendants' argument, stating that "[c]ertainly the deception of the independent stockholders is no less real because, 'formalistically,' the corporate entity was the victim of the fraud." *Id.*

Boesky attempts to distinguish *Pappas*, arguing that the "fundamental premise" of that case and others like it is that the defendants were officers and directors who had a clear conflict of interest with the corporation. Boesky argues that here plaintiffs do not allege that when Boesky filed his 13D's, he knew or should have known of any conflict of interest between Posner and PEC. Boesky also asserts that plaintiffs have not alleged that when Boesky filed the 13D's, he knew or should have known that PEC would later sell the Fischbach securities at a substantial loss.

*Pappas* admittedly is distinguishable from the facts in this case in that Boesky is not a director of PEC. However, that distinction is of little consequence. Boesky cites no authority for his restrictive reading of *Pappas*. Essentially, Boesky asks the Court to impute Posner's knowledge to PEC as far as the count against Boesky is concerned, while conceding that Posner's knowledge cannot be imputed to PEC for purposes of the 10b–5 count against Posner. This argument ignores the warning in *Pappas* against "formalistic" arguments in this area. Boesky's argument that PEC should be held to know vis-a-vis Posner, but not to know the same information vis-a-vis Boesky is pure formalism. Here, the complaint alleges that Posner and Boesky were parties to a "secret agreement" to defraud PEC, whereby, *inter alia*, Boesky was to be insured against any loss incurred by purchasing and holding Fischbach securities on Posner's behalf. The complaint also alleges that Boesky knew Posner was filing false financials when Boesky was filing his 13D's. Thus, even under Boesky's formalistic rationale, Boesky cannot claim that plaintiffs have failed to allege that Boesky knew of any conflict of interest between Posner and PEC. For these reasons, Boesky's motion to dismiss Count I will be denied.

## C. *The 10b–5 Aiding and Abetting Count Against All Defendants.*

In Count II, plaintiffs allege that Posner and Boesky each aided and abetted the other's 10b–5 violation, and that Drexel aided and abetted Posner's 10b–5 violation by financing the purchase of the Fischbach securities from Boesky, as well as Boesky's reimbursement cost. All three move to dismiss Count II for failure to state a claim. For the reasons set forth below, Posner's and Boesky's motions will be denied, but Drexel's motion to dismiss will be granted.

The Third Circuit has held that there are three elements to a claim of aiding and abetting a 10b–5 violation. First, there must be an underlying, independent wrong; second, the aider or abettor must know of the wrong's existence; and third, substantial assistance must be given to effect the wrong. *Landy v. FDIC,* 486 F.2d 139, 162–63 (3d Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The "knowledge" requirement in the present context has been construed to mean that the aider or abettor was "privy to misleading communications." *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 791 (3d Cir.1982), *cert. denied,* 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983). The "substantial assistance" requirement is somewhat more complex. The Third Circuit has looked to the Restatement of Torts for guidance in making the determination and has found the following factors to be relevant: (1) the amount of assistance given by the defendant; (2) the defendant's presence or absence at the time of the tort; (3) the defendant's relation to the other person; and (4) the defendant's state of mind. *Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 800 (3d Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). "Some link" between the defendants is required, but this link may be inferred from prior relationships, common benefits, and other factors. *See Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 889 n. 16 (3d Cir. 1975). With these principles in mind, the Court turns to defendants' respective motions to dismiss the aiding and abetting counts.

### 1. The Independent Wrong Requirement.

As set forth in part B, *supra,* the Court concludes that plaintiffs have adequately alleged a 10b–5 violation and, thus, the existence of an independent wrong, which is the first element of an aiding or abetting claim.

### 2. The Knowledge Requirement.

■ As to the second element, the Court concludes that it has been adequately alleged as against Posner and Boesky, but not as against Drexel. As to Posner and Boesky, plaintiffs allege that both knew or should have known that the other's filings were false and misleading as part of the alleged secret agreement between them. Again, a trier of fact may ultimately find otherwise, but plaintiffs should be permitted the opportunity to adduce evidence at trial to support these allegations. If, in fact, a secret agreement existed between Posner and Boesky, a trier of fact could find that each was "privy" to the other's filings which concealed the existence of that agreement. In *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985), the court warned against subjecting allegations of fraud to "too strict a scrutiny." The court read Rule 9(b) to require plaintiff to "plead with particularity the 'circumstances' of the alleged fraud in order to place the defendant on notice of the precise misconduct" charged. *Id.* Plaintiffs can use various means of "injecting precision and some measure of substantiation" into the fraud allegations. *Id.* By alleging a secret agreement between Posner and Boesky, pursuant to which each allegedly aided and abetted the other's 10b–5 violation, plaintiffs have satisfied these flexible requirements.

■ However, as to Drexel, the complaint fails to allege properly that Drexel had knowledge of Posner's and Boesky's allegedly false filings. Nothing in the com-

plaint suggests that Drexel was "privy" to the filings. Count II merely avers that by arranging financing for PEC purchase of Boesky's Fischbach securities, Drexel knew or should have known of the allegedly false 13D's and 10–Q's. The Court concludes that arranging financing, unlike being party to a secret agreement to defraud a corporation, is not a circumstance of any alleged fraudulent knowledge.

3. The Substantial Assistance Requirement.

As to the third element of aiding or abetting a 10b–5 violation, the Court concludes, as it did with regard to the second element, that plaintiffs have properly alleged the element as against Posner and Boesky but not as against Drexel. With regard to Posner and Boesky, the Court finds that their relation to each other, and the "link" that can be inferred from prior relationships when viewed in light of the common benefits, are significant. It is the alleged secret agreement between Posner and Boesky that is the heart of plaintiffs' contentions and most of the wrongful acts alleged flow from that agreement. Because "substantial assistance" between Posner and Boesky could be inferred by a trier of fact from the existence of a secret agreement that allegedly benefitted both of them, I am persuaded that plaintiffs' allegations survive Posner's and Boesky's motion to dismiss.

Drexel's situation, however, is a different matter. Plaintiffs stress Drexel's alleged role in arranging a $2.5 million payment to Boesky to reimburse him for losses incurred by buying and holding the Fischbach securities. However, in *Landy, supra,* the Third Circuit dismissed a count against brokerage firms of aiding or abetting a 10b–5 violation by a president of a bank. The court applied the same factors listed in *Monsen, supra,* and concluded that the amount of assistance rendered by the brokers was "minor"; that the brokers were not present when the fraud occurred; that they were not involved in making any misrepresentations; and that the intention behind the financing was not to accomplish

a fraud, but rather the independent goal of obtaining a commission. *Landy,* 485 F.2d at 163. The court found that "[w]e have no allegation in this case that the brokers proposed to bring about the publication of the false financials and the consequent fraud upon the stock purchasers." *Id.* at 164. Similarly, in this case, Drexel's alleged role in arranging the reimbursement financing is insufficient to withstand Drexel's motion to dismiss. Drexel may well have benefitted from the financing (allegedly it generated a $3 million fee), but nothing in the complaint suggests that Drexel in any way intended to participate in false or misleading filing.

Thus, Posner's and Boesky's motions to dismiss Count II will be denied, while Drexel's motion to dismiss the 10b–5 aiding or abetting count will be granted because neither the second nor the third element of such a claim has been adequately alleged against Drexel.

D. *The 13(d) Count Against Posner and Boesky.*

In Count III, plaintiffs seek to recover money damages against Posner and Boesky, under § 13(d) of the Exchange Act, for filing 13D's that failed to disclose the existence of the alleged secret agreement. Both Posner and Boesky move to dismiss for failure to state a claim, arguing that no private right of action for money damages exists under § 13(d). For the reasons set forth below, both motions will be granted.

This Court has on two occasions addressed issues close to the one before it now, but the precise question of whether a private cause of action for money damages exists under § 13(d) has not yet been determined in this district. In *Jacobs v. Pabst Brewing Co.,* 549 F.Supp. 1050 (D.Del. 1982), the Court concluded that an implied cause of action exists under § 13(d) for injunctive relief. Two years later, in *Kalmanovitz v. Heileman Brewing Co.,* 595 F.Supp. 1385 (D.Del.1984), *aff'd,* 769 F.2d 152 (3rd Cir.1985), the Court held that no private right of action for money damages exists under § 13(e) of the Exchange Act.

Section 13(d) does not expressly create a private cause of action for money damages. It merely requires disclosure of certain information by any person who acquires more than 5% of a class of any equity security registered under the Act. Thus, to hold that a private cause of action for money damages exists under § 13(d), the Court would have to infer one.

In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court set out four factors to be considered when determining whether a private remedy is implicit in a statute that does not expressly provide one: (1) whether the plaintiff is a member of a class for whose especial benefit the statute was enacted; (2) legislative intent; (3) the underlying purpose of the legislative scheme; and (4) whether the cause of action is one that is traditionally relegated to state law. *Cort*, 422 U.S. at 78, 95 S.Ct. at 2087. Since *Cort*, the Supreme Court has refined and restricted its analysis. Following Justice Powell's dissent in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court decided *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), in which the issue was whether an implied cause of action exists for damages under § 17(a) of the Exchange Act. In that case, noting that each of the four *Cort* factors is not necessarily entitled to equal weight, the Court said, "[t]he central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action." *Id.* at 575, 99 S.Ct. at 2489. Finally, in *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), the court added that the "contemporary legal context" in which Congress amends a statute is relevant for determining legislative intent to create a private cause of action. Specifically, "[w]hen Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts ... the question is whether Congress intended to preserve the preexisting remedy." *Id.* at 378–79, 102 S.Ct. at 1839.

With this judicial history in mind, and having already concluded that the express language of § 13(d) does not create a private cause of action for money damages, the Court turns to the legislative history of § 13(d), as well as the overall remedial scheme of the Exchange Act as it relates to the question presented.

1. Legislative History of § 13(d).

Section 13(d) was enacted in 1968, as part of the Williams Act, and amended in 1970 and 1977. The well-recognized purpose of § 13(d) is "to provide shareholders and potential investors with information about a change in ownership and control of the issuer to enable them to make informed investment decisions." *Jacobs*, 549 F.Supp. at 1057 (citing S.Rep. No. 550, 90th Cong., 1st Sess. 7 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess. 8, *reprinted in* 1968 U.S. Code Cong. & Admin.News, 2811–12). On the precise issue of whether Congress intended to create a private right of action for money damages under § 13(d), however, the legislative history is "largely silent." See Note, *Private Rights of Action for Damages Under Section 13(d)*, 32 Stan.L.Rev. 581, 591–92 (1980). At best the legislative history is vague and it certainly is not compelling. Indeed, one of the difficulties with looking for legislative history to support an implied cause of action is that, by its very nature, the analysis requires a court to search for something that may never have been contemplated by Congress or that was rejected without discussion.

Nonetheless, relying on the Supreme Court's directive in *Merrill Lynch, supra,* to consider the "contemporary legal context" of amendments as part of the legislative history analysis, the Court in *Jacobs* concluded that a private cause of action for injunctive relief under § 13(d) could be inferred. After citing several pre–1977 judicial determinations that a private cause of action exists under § 13(d), as well as five references to private causes of action in the legislative history of the 1977 amendments, the Court concluded "that the Congress intended to preserve a private cause of

action which had been judicially created." *Jacobs,* 549 F.Supp. at 1062.

However, these pre–1977 cases which the *Jacobs* Court relied on held that a private injunctive remedy, not a damage remedy, could be implied from § 13(d). Similarly, the legislative history cited in *Jacobs* either refers only to injunctive relief or is vague, and therefore unpersuasive, on the issue of a private remedy for money damages. Although pre–1977 case law and the legislative history of the 1977 amendments support a conclusion that a private cause of action for injunctive relief exists under § 13(d), these authorities do not support a similar conclusion with respect to a remedy for money damages.

### 2. Other Remedial Provisions in the Exchange Act.

The relevant Supreme Court cases cited above also indicate that the overall remedial scheme of the act should be considered. For example, in *Touche Ross, supra,* in which the Court decided not to infer a private cause of action under § 17(a) of the Exchange Act, the Court cited §§ 9(e), 16(b), and 18(a) of the Act, all three of which expressly grant private rights of action, and concluded that "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Id.* 442 U.S. at 571–72, 99 S.Ct. at 2487.

In the present context, the availability of a private remedy for money damages under § 18(a) of the Exchange Act is most relevant. Section 18(a) expressly creates a private remedy, for money damages or injunctive relief, against "[a]ny person who shall make or cause to be made any statement in any application, report or document filed pursuant to this chapter or any rule or regulation thereunder.... [which is] false or misleading with respect to any material fact." 15 U.S.C. § 78r(a) (1982). At least two district courts, principally the Southern District of New York, but also the Northern District of Illinois, have seized on the availability of a remedy under § 18(a) in refusing to infer a private cause of action for money damages under § 13(d). *Issen*

*v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1295 (N.D.Ill.1981); *Wellman v. Dickinson,* 497 F.Supp. 824, 835 (S.D.N.Y. 1980), *aff'd,* 682 F.2d 355 (2d Cir.1982), *cert. denied sub nom, Dickinson v. SEC,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

Although in dictum in *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), the Supreme Court intimated that persons might have an action for damages for a § 13(d) violation, *see id.* at 60 and n. 10, 95 S.Ct. at 2077 and n. 10, the Court did not state that the remedy would lie under § 13(d). The dictum in *Rondeau* is not inconsistent with the view among district courts that § 18(a) of the Exchange Act, not § 13(d), is the proper section under which a private party can sue for money damages resulting from false and misleading § 13(d) statements.

To summarize, based on the language of § 13(d), which is silent on the issue of a private cause of action for money damages, the legislative history of § 13(d), which is scant and not compelling on the issue of a private remedy for money damages, and the express private damages remedy available under § 18(a) for a § 13(d) violation, I conclude that no implied cause of action for money damages exists under § 13(d). Because Count III seeks to recover damages only under § 13(d), Posner's and Boesky's respective motions to dismiss the § 13(d) count will be granted.

### E. The RICO Count Against Posner.

In Count IV, plaintiffs allege that Posner violated two RICO sections, 18 U.S.C. §§ 1962(c) and (d). Posner moves to dismiss on grounds that the allegations fail to state a claim. For the reasons set forth below, Posner's motion to dismiss will be denied.

A § 1962(c) violation requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Posner does not contest that either of the first two elements have been alleged, rather, Posner asserts that neither a "predicate offense"

nor a "pattern" of racketeering activity has been properly pleaded.

As set forth in part B of this Opinion, *supra*, plaintiffs have properly alleged a 10b–5 violation; they have also adequately alleged predicate mail and wire fraud violations under 18 U.S.C. §§ 1341, 1342. For these reasons, the Court concludes that Posner's predicate offense argument is without merit. Posner's second argument, that no "pattern" of racketeering activity has been alleged, also is not persuasive. The Third Circuit, as well as this Court, have discussed the "pattern" requirement. Recently, the Third Circuit expanded upon a footnote in the *Sedima* opinion, in which the factor of "continuity plus relationship" between acts of racketeering activity was clarified. In *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36 (3d Cir.1987), the court listed factors relevant to a case-by-case determination of whether a "pattern" exists, including, but not limited to "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of the victims, the number of the perpetrators, and the character of the unlawful activity." *Id.* at 39. *Barticheck* also rejected both the position that a RICO pattern must involve at least two distinct unlawful schemes and the notion that acts committed pursuant to a single scheme can constitute a "pattern" only if the scheme is "open ended". *Id.* This Court has stated that the continuity needed for a pattern "requires some separation as well as relatedness of the acts in question.". *Paul S. Mullin & Assoc. v. Bassett*, 632 F.Supp. 532, 541 (D.Del.1986).

Here, plaintiffs have alleged a single scheme comprising several acts, commencing in April 1984, and lasting at least through March 1985, arguably through 1987. Although "formalistically" the single victim is PEC, in reality every shareholder of PEC is a victim of the alleged scheme. The alleged acts (filing false 13d's and 10–Q's, as well as acts of mail and wire fraud) are different in nature and yet all related to the purported scheme.

In view of these allegations, I conclude that Count IV withstands Posner's motion to dismiss. Plaintiffs have adequately alleged a violation of § 1962(c). As to Posner's argument that a § 1962(d) conspiracy with Boesky has not been alleged, I also find in favor of plaintiffs. The alleged secret agreement between Posner and Boesky, as stated earlier, is the heart of the entire complaint, and thus Posner's motion to dismiss Count IV will be denied.

### F. *The Breach of Fiduciary Duty Count Against All Defendants.*

In their last count, plaintiffs allege that Posner and Drexel breached their fiduciary duties to PEC and that both Boesky and Drexel aided and abetted Posner's alleged breach. All three defendants argue that this Court lacks subject matter jurisdiction over these pendent state law claims if the federal claims are dismissed. In addition, Boesky and Drexel argue that the count fails to state a claim as against them. For the reasons set forth below, Posner's and Boesky's motions to dismiss will be denied and Drexel's will be granted.

Federal claims predominate in this litigation and, with the exception of Count III, they have not been dismissed. Thus, it is proper for the Court to retain jurisdiction. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed. 2d 218 (1966).

 Boesky's alternative argument, that the complaint fails to allege a claim that he aided and abetted Posner's breach of fiduciary duty, fails for much the same reason that his argument failed in the context of aiding and abetting Posner's 10b–5 violation (see part C, *supra* ). The elements of aiding or abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; and (3) knowing participation in the breach by the non-fiduciary. *Weinberger v. Rio Grande Industries*, 519 A.2d 116, 131 (Del.Ch.1986). Boesky argues that "knowing participation" by Boesky of Posner's alleged breach has not been properly pleaded. However, as the Court discussed earlier, this is exactly what

the complaint alleges and a trier of fact could infer such knowledge from the existence of the alleged secret agreement between Posner and Boesky.

 Again, Drexel's alternative arguments are more persuasive. First, Drexel argues that it could not possibly have breached a fiduciary obligation to PEC because it does not have such a duty. The complaint alleges that Drexel owed PEC a fiduciary duty "as PEC's investment banker." However, Drexel's status as PEC's investment banker does not necessarily give rise to an owing of a fiduciary duty. Plaintiffs cite no authority to support their contention that Drexel owed a fiduciary obligation on account of its limited role in arranging financing. Indeed, under Delaware law, "a contract, in itself, does not impose fiduciary duties on the contracting parties. Even if the contract shows that plaintiff placed a 'quantum of trust' in a defendant that the defendant accepted, no fiduciary relationship can exist without superiority on the part of the defendant." *Satellite Financial Planning Corp. v. First Nat'l Bank*, 633 F.Supp. 386, 401 (D.Del.) (citing *Cheese Shop Internat'l, Inc. v. Steele*, 303 A.2d 689-90 (Del.Ch.), *rev'd on other grounds*, 311 A.2d 870 (Del. 1973)), *modified in part*, 646 F.Supp. 118 (D.Del.1986). Plaintiffs have not alleged the requisite superiority on Drexel's part to even raise the possibility of a fiduciary obligation running from Drexel to PEC. Indeed, plaintiffs seem to have abandoned this position entirely in their briefs.

Plaintiffs also allege in their last count that Drexel aided and abetted Posner's breach of Posner's fiduciary duty, but, for reasons similar to those stated in the 10b-5 context, such a claim against Drexel must be dismissed. Unlike the alleged secret agreement between Posner and Boesky, there is no alleged connection between Posner and Drexel from which a trier of fact could reasonably infer that Drexel "knowingly participated" in Posner's alleged breach. For these reasons, Drexel's motion to dismiss the fiduciary duty count will be granted, but Posner's and Boesky's motions will be denied.

## IV. CONCLUSION.

In conclusion, therefore, the motions to dismiss under Rule 23.1 will be denied; as to Count I, Posner's and Boesky's motions to dismiss will be denied; as to Count II, Posner's and Boesky's motions to dismiss will be denied, but Drexel's motion to dismiss will be granted; as to Count III, Posner's and Boesky's motions to dismiss will be granted; as to Count IV, Posner's motion to dismiss will be denied; and as to the last count, Posner's and Boesky's motions to dismiss will be denied, but Drexel's motion to dismiss will be granted.

An Order consistent with this Opinion will be entered.